UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JANE DOE,                              )
      Plaintiff,                      )
                            )
      vs.                              )      Case No. 17 CV 1158
                            )
MARQUETTE UNIVERSITY,      )      JURY TRIAL DEMANDED
      Defendant.                      )

## COMPLAINT

JANE DOE, by and through her counsel, Salvatore Prescott & Porter, PLLC, brings this action, as follows:

## I. INTRODUCTION

1.    Defendant MARQUETTE UNIVERSITY recklessly allowed a male student who had already threatened and harmed another female student to return to campus. When the male student then raped JANE DOE, MARQUETTE knew it had done wrong. Rather than help and support DOE, MARQUETTE tried to sweep its mistake under the rug, discouraging DOE from reporting the rape to law enforcement and seeking to discredit DOE as a student.

## II.    JURISDICTION AND VENUE

2.    This Court has subject-matter jurisdiction over plaintiff's federal claims, arising under the laws of the United States, pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

1

3.    This Court also has subject-matter jurisdiction over this matter under 28 U.S.C. § 1332, because the parties are citizens of different states, and the amount in controversy exceeds $75,000. Specifically, plaintiff is domiciled in Illinois, where she resides. Defendant is domiciled in Wisconsin, because it is a corporation registered to do business in Wisconsin with its principal place of business in Wisconsin.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the events giving rise to the claims occurred in this district.

## III.   THE PARTIES

5.    Plaintiff JANE DOE is an individual in her early twenties who resides in the Northern District of Illinois. She sues under a pseudonym to protect her identity.

6.    Defendant MARQUETTE UNIVERSITY is a private university located in downtown Milwaukee, Wisconsin. On information and belief, MARQUETTE received federal financial assistance during the time period at issue in this case.

## IV.   FACTUAL ALLEGATIONS

7.    DOE began attending MARQUETTE as a freshman in or about August 2013. DOE was enrolled in MARQUETTE's College of Nursing. Once students are admitted to the College of Nursing, they are guaranteed all required classes and clinical hours, enabling students not only to graduate

2

with a college degree but also, upon graduation, to assimilate into the nursing profession.

8.  DOE had a normal, uneventful first year at MARQUETTE. She made friends, earned good grades (with approximately a B average), and enjoyed the nursing program.

9.  During her first year at MARQUETTE, DOE met another MARQUETTE student named KW. Although KW repeatedly expressed a sexual interest in DOE, and they once attended a dance together, they were not in a romantic relationship.

**KW Sexually Assaults DOE**

10.  In or about August 2014, after summer vacation, DOE returned to MARQUETTE for her sophomore year. Throughout August, KW sent DOE text messages that were at times rude, crude, demeaning, and hostile. DOE repeatedly told KW that she had a boyfriend and asked KW to communicate with her civilly or leave her alone.

11.  On or about August 21, 2014, KW threatened DOE by text message, "If I wanted to I could've railed you any night of my choosing ever since I met you. And there's no doubt in my mind I'm going to rail you sometime this semester. Nothing like you've ever experienced before. I would be doing you the favor." DOE responded, "That's not going to happen."

3

12. A few days later, in the early morning hours of August 24, 2014, DOE met with KW when she was intoxicated, and he raped her.

13. The next day, DOE sent KW multiple text messages, telling him that they needed to speak. He told DOE, "text me what you want to say." DOE wrote, "Its about Saturday night. What you did was absolutely horrible…." KW then agreed to speak with DOE, who told him that she was going to report the sexual assault. KW admitted he had raped DOE but told her that if she went to the police, no one would believe her.

## At the Time of DOE's Assault, MARQUETTE Was Already Under Scrutiny for Title IX Non-Compliance

14. In 2011—a few years before DOE was assaulted—MARQUETTE officials acknowledged that they made mistakes in handling student reports of sexual assaults, including by failing to report incidents to Milwaukee police as required by state law. In order to remedy those failures, MARQUETTE said it was improving how the university reported incidents of sexual assault to the Milwaukee police. These changes came only after a former student said that MARQUETTE dismissed her allegations that a student-athlete had sexually assaulted her.

15. At that time, MARQUETTE officials told the press: "There were a lot of things I think we found that we were not proud of, as you can imagine. We have initiated a lot of conversations since then on campus as well

4

as with local law enforcement . . . to really help us learn from that. It will not happen again."

16.    In April 2014, MARQUETTE was again at the center of attention involving sexual assault when three fraternities were investigated and issued official warnings stemming from allegations of sexual assault.

17.    Moreover, in and around 2015, around the same time as incidents described in this Complaint, MARQUETTE was under investigation by the U.S. Department of Education for possibly mishandling an incident involving sexual harassment.

**MARQUETTE Discourages DOE from Reporting the Assault**

18.    After the sexual assault, DOE was scared and upset. She called her parents, who immediately came to the MARQUETTE campus. Together, DOE and her parents went to MARQUETTE's Department of Public Safety to report the attack.

19.    Despite the fact that KW had committed a serious violent crime—and despite MARQUETTE's prior mishandling of situations like this one—MARQUETTE's Department of Public Safety discouraged DOE and her parents from reporting the crime to the Milwaukee Police Department. Moreover, despite the fact that DOE specifically asked what her options were, no one informed DOE or her parents about Title IX or her option to pursue a complaint under MARQUETTE's complaint procedures.

5

20.     Notwithstanding MARQUETTE's repeated efforts to dissuade DOE from contacting police, DOE insisted that she wished to report the rape to the Milwaukee Police Department. At DOE's request, the police responded and took DOE's statement.

21.     The police secured an arrest warrant for KW. DOE feared encountering KW, who lived across from DOE's dormitory. Even though MARQUETTE knew the danger that KW posed to DOE and other students, MARQUETTE refused to allow the police to arrest KW on campus. During the days that it took for the police to track KW down off campus, DOE was frightened and stayed in a hotel with her parents until police notified her that KW was in custody.

22.     On or about August 29, 2014, KW was arrested and charged with third-degree sexual assault.

23.     On or about September 3, 2014, while KW was still in custody, DOE and her parents met with MARQUETTE's Assistant Vice President for Student Affairs and asked what the school was going to do. The Assistant Vice President, who failed to inform DOE about Title IX or DOE's ability to lodge a complaint with the school, was non-committal concerning what action MARQUETTE would take concerning the rape. The Assistant Vice President said only that people at MARQUETTE would discuss the issues.

6

24.     DOE's parents also specifically asked the Assistant Vice President whether KW had any disciplinary history. In response, the Assistant Vice President said that KW was a MARQUETTE student. DOE's parents followed up, asking if KW had any issues. The Assistant Vice President just repeated that KW was a MARQUETTE student.

25.     DOE's parents met with the Assistant Vice President again on or about September 5, 2014, and notified the Assistant Vice President that the Milwaukee County District Attorney was bringing formal charges against KW. DOE's parents provided a copy of the charges and asked what MARQUETTE was going to do. Again, the Assistant Vice President provided no information about Title IX and gave no assurances that the school would take any action.

26.     On or about September 5, 2014, KW withdrew from MARQUETTE. When DOE's parents followed up with the Assistant Vice President, the Assistant Vice President stated that because KW withdrew, the school would take no action.

27.     To DOE's knowledge, MARQUETTE never commenced a Title IX investigation or took other action concerning KW with respect to the sexual assault.

28.     With respect to DOE, MARQUETTE assigned a counselor who, upon information and belief, was serving in an interim capacity and had

7

no training working with sexual-assault victims. DOE received calls from the counselor at random times, asking questions like, "Hi, how are you feeling about being raped?" The calls were insensitive and very upsetting to DOE.

29. DOE also discussed the sexual assault with her Academic Advisor, who instructed DOE to notify her teachers about what had happened. DOE told each of her teachers at MARQUETTE that she had been sexually assaulted by another student at the beginning of the school year.

**KW Tries to Turn the Tables**

30. In or around late 2014, right before a critical motion hearing in his criminal case, KW sent a letter to MARQUETTE alleging that DOE had raped *him* the previous year, when DOE was a freshman.

31. The letter was ridiculous, and it was false.

32. The Milwaukee police who were working on DOE's rape case turned KW's complaint over to a different set of investigators to ensure that there would be an independent review. Ultimately, the police completely cleared DOE of KW's complaint. Because of KW's false charges, he was cited with an additional felony and two misdemeanor charges for intimidating a victim and obstruction.

8

**DOE Learns about KW's Past**

33.    Another MARQUETTE undergraduate student approached DOE in or about January 2015. The student informed DOE that in or around early 2014—when DOE was a freshman at MARQUETTE—KW had stalked and intimidated the student. KW sent the student angry, harassing, and degrading text messages; posted hostile slurs about her on social media; and aggressively approached and followed her on campus. The student was extremely frightened by KW, fearing for her safety and repeatedly seeking recourse with MARQUETTE's Department of Public Safety.

34.    Also, just as KW had done with DOE—trying to turn the tables and accusing DOE of raping him—KW had used the same tactic the previous year, when under investigation for stalking the student. That is, KW had attempted to shift blame to the student, telling MARQUETTE that the student had previously stalked him.

35.    Because of KW's misconduct toward the student, MARQUETTE suspended KW from the school, in or about spring 2014. There was also a no-contact order in place at MARQUETTE, prohibiting KW from having contact with the student.

36.    Inexplicably, though, KW's suspension did not stand. MARQUETTE's Vice President for Student Affairs overruled that decision, and KW was permitted to return to MARQUETTE in fall 2014 on the

9

conditions that he, among other things: (1) write a reflection letter to the student, and (2) receive counseling.

37.    According to the student, KW never provided her with a reflection letter.

38.    Moreover, on information and belief, KW never provided MARQUETTE with evidence that he received counseling or wrote the required reflection letter to the student before returning to MARQUETTE's campus.

**MARQUETTE Retaliates Against DOE**

39.    Once DOE learned this information about KW, DOE and her parents confronted MARQUETTE, trying to understand why KW had been permitted back on campus. It also became clear to DOE that the information about the other MARQUETTE student was very important to the criminal case against KW and should be turned over to the prosecution. Although MARQUETTE knew all of this information before and could have shared it with the District Attorney's Office, MARQUETTE did so only at DOE's urging, and only after the student alerted DOE.

40.    DOE tried to remain focused on succeeding in MARQUETTE's nursing program. Rather than recognizing the trauma that DOE had experienced and helping her overcome the new obstacles facing her, however, MARQUETTE embarked on a campaign to discredit DOE and ultimately to run her out of the school. Throughout 2015 and 2016, in

10

particular—after KW filed a complaint with MARQUETTE about DOE—MARQUETTE appeared to have two motivations: (1) to deter future sexual-assault victims from pursuing charges, as DOE had done, and (2) to intimidate DOE, in an effort to cause her to leave MARQUETTE, protect MARQUETTE against legal action, and discredit DOE as a complainant.

41.    This retaliation took multiple forms. First, despite knowing that DOE was a witness in the ongoing criminal proceedings against KW, requiring frequent interviews and meetings with police and prosecutors, which were stressful and difficult for DOE, MARQUETTE failed to support DOE's participation in those proceedings and failed to provide reasonable academic accommodations.

42.    When KW accused DOE of assaulting him, in late 2014, the Milwaukee County District Attorney's Office informed DOE that she would be interviewed, either by MARQUETTE's Department of Public Safety (because KW had made the complaint directly to MARQUETTE) or by the Milwaukee Police Department. A representative for DOE contacted MARQUETTE's Associate General Counsel and informed him about KW's accusation and the circumstances.

43.    Throughout this time, DOE did not know who would be reaching out to her or when the request would occur. This hung over DOE's head.

44. In or about January 2015, the Milwaukee police called DOE to come in to the police department that day to be interviewed about KW's complaint. DOE was scheduled to take a critical test in her Pathophysiology 1 class just a couple of hours after the call from police. The test was important. DOE had completed Pathophysiology 1 the previous semester, but DOE's instructor had given DOE the option to take this particular test in January, after the semester's end.

45. Nervous, but not wanting to rock the boat, DOE took the test. She got a C/D (meaning: under 78%), which—in the MARQUETTE nursing school's grading scheme—constituted a failing grade.

46. The Pathophysiology 1 class was a prerequisite for the other classes DOE was taking during the spring semester. DOE's Academic Advisor told DOE that because of her C/D grade, she would not be permitted to proceed with her spring classes and needed to leave MARQUETTE immediately. The Advisor said that DOE could no longer attend the classes she had already started and that she could not remain in the dorms.

47. DOE's mother contacted the Advisor, explained that DOE had been contacted by police right before the test to be interviewed about KW's accusation against DOE, and asked that DOE be given an opportunity to retake the test. The Advisor said no. The Advisor said that DOE would be

required to take a full withdrawal on medical leave, or MARQUETTE would not refund the tuition that DOE had already paid for the semester.

48. DOE's mother engaged the Advisor in discussions about alternatives. DOE's parents were willing to do anything to keep DOE in school, as much on schedule and with as much normalcy as possible. The Advisor shot down every suggestion. Despite the fact that MARQUETTE routinely allowed other nursing students who did not pass a prerequisite class to remain at school and take electives or other classes, MARQUETTE repeatedly told DOE's parents that they would not accommodate DOE.

49. Only after DOE's mother specifically called out MARQUETTE for trying to get rid of DOE the month before KW's criminal trial did MARQUETTE relent in part, allowing DOE to stay in the dorms and take just one class for spring of her sophomore year. MARQUETTE also—after initially refusing, repeatedly, to do so—refunded a portion of tuition for the classes that DOE was not being permitted to take. Although this arrangement allowed DOE to remain enrolled at MARQUETTE and maintain the regularity of living on campus, it still constituted a significant setback for DOE, who wanted to be and should have been a full-time student taking a full course load.

50. A representative of the Milwaukee County Office of the District Attorney reached out to MARQUETTE on DOE's behalf, describing in detail the many demands on DOE as part of the investigation. The letter stated

13

in part, "It is very common for victims of sexual assault to struggle with concentration, sleep disturbances, anxiety, and hypervigilance in the wake of this type of incident. Not only does [DOE] bear the weight of those types of challenges, she is experiencing additional pressures related to the Criminal Justice System." The District Attorney's Office urged MARQUETTE to support DOE and her efforts to continue her education.

51. Despite this advocacy by DOE's parents and law enforcement, MARQUETTE continued to refuse to provide reasonable academic accommodations to DOE. For instance, in spring semester 2016, DOE was enrolled in Nursing 2002. Twenty percent of her course grade was based on an online quiz that students were permitted to take throughout the semester. Students were permitted to retake the quiz as many times as needed to earn 100% on the quiz. DOE timely took what she believed was the correct quiz and earned 100%. DOE noticed, though, that the teacher had not posted her quiz grade in the online gradebook. This was not out of the ordinary, because the teacher was routinely slow in posting grades. Toward the end of the semester, when the quiz grade still had not been posted, DOE met with the teacher to inquire.

52. During the meeting, the teacher informed DOE that DOE had taken the wrong online quiz. The teacher refused to allow DOE to take the correct quiz, stating that it was too late. DOE told the teacher, who knew about

14

DOE's sexual assault, that she was willing to do any extra assignments necessary to make up for the quiz, but the teacher refused. Instead, the teacher asked what DOE was doing this summer to help herself. DOE told the teacher about her internship. The teacher said words to the effect of, "No, what are you doing about therapy?" DOE explained that she continued to attend therapy. The teacher then stated, in substance, that she did not think DOE was mentally stable enough to be at MARQUETTE because of the sexual assault, and that she was worried about DOE's current and future performance in the clinical program.

53.     Any suggestion that DOE was struggling in the clinical program was false. DOE was succeeding in clinicals, and her clinical teacher had even praised DOE as a standout student. But more to the point—even though DOE had already experienced clear retaliation as a result of reporting and pursuing the sexual-assault charge against KW—the comment made DOE more aware that teachers in the nursing school were holding the sexual assault, and DOE's pursuit of accountability for her attacker, against her.

54.     DOE followed up with the Dean of the nursing school to address her Nursing 2002 grade and the teacher's refusal to allow her to take the online quiz. The Dean agreed to provide DOE the opportunity to take the quiz, stating that there was no hurry, DOE's grade would be marked as

incomplete, and that DOE had until October to take the quiz and complete the course.

55.     Despite the Dean's giving her until October, DOE did the quiz right away in May and earned 100%. Because it was an online quiz, DOE's grade was immediately posted to her teacher. With the inclusion of the online quiz, DOE was set to earn an A in the class.

56.     But just hours after she completed the quiz—and within weeks of KW's scheduled trial (which had been postponed)—MARQUETTE notified DOE that she was being placed on academic probation. With the Nursing 2002 course marked incomplete—and, therefore, without the benefit of the A that would ultimately be posted as DOE's grade—DOE's grade point average was 2.62. Under MARQUETTE's usual policy, academic probation was imposed for students with a grade point average below 2.5.

57.     This did not make sense, both because DOE's grade point average exceeded 2.5 and also because the Dean had specifically told DOE that she would be able to have her quiz counted as part of her Nursing 2002 grade. When DOE pointed out this out, the only explanation DOE was given was words to the effect of, "We sometimes do that."

58.     While suffering under the stress of the imminent KW trial, DOE filed a formal appeal, protesting her academic probation. MARQUETTE demanded access to DOE's medical records, including records concerning

16

mental-health treatment. This was an unreasonable and invasive request, part of MARQUETTE's continuing effort to damage and intimidate DOE. Ultimately, DOE's treating physician provided a letter stating, in substance, that DOE should be in school and certainly was stable enough to be at MARQUETTE.

59. Only after DOE pushed back on MARQUETTE's unfair and unreasonable treatment did MARQUETTE agree, in or about June 2016, to lift the academic probation and allow DOE to return for the fall semester.

60. Over the summer, DOE was determined to return to MARQUETTE and put the past behind her. When she returned for the fall semester, though, she encountered resistance from MARQUETTE.

61. In or about October 2016, MARQUETTE administrators informed DOE that she could not attend clinicals—required courses for the nursing program—because DOE's mandatory drug test had not been properly uploaded. DOE was informed about this snafu at around 4:30 pm on a Wednesday, when the clinicals were scheduled for Thursday and Friday. Although DOE offered to provide the results from a drug test administered by her doctor, MARQUETTE refused to accept the test. As a result, DOE missed the Thursday and Friday clinicals, taking her otherwise-A grade down to a C.

62. By contrast, at least one other student who was missing a critical requirement—proof of a current flu shot—was assisted by the nursing

17

department and did not have to miss clinicals. DOE was not given such accommodation.

63.    In or about December 2016, DOE was notified that she was slated to receive a C/D (by .038%) in her maternity class. Although DOE knew she did not have an A going in to the final exam, she had not known that she was in jeopardy of finishing without a passing grade. DOE believed that she had completed assignments correctly and performed well in the class. After seeing the C/D final grade, DOE tried to discuss the grade with her professor, but the professor refused, stating only that DOE's group paper—on the topic of sexual assault—did not meet standards. It did meet standards, however.

64.    Around this time, one of DOE's clinical instructors in the nursing program informed DOE that the instructor was resigning from MARQUETTE because of the way the school treated students.

**Harm to DOE**

65.    Ultimately, DOE could no longer endure MARQUETTE's conduct toward her. In 2017, DOE left MARQUETTE and transferred to a community college where she could get back on her feet and prepare to transition to a different nursing program. DOE has been earning straight As since leaving MARQUETTE.

66.    MARQUETTE's actions caused DOE significant harm. First, DOE has suffered trauma and emotional distress as a result of being raped by

KW and a result of the way MARQUETTE treated her. Since the attack, DOE has needed regular therapy and psychiatric treatment. Her physicians prescribed and DOE now takes medication for Post-Traumatic Stress Disorder-related anxiety and depression, as well as sleep medication to block recurring nightmares about the rape. Had MARQUETTE followed through with its expulsion of KW and exercised due care for its students, KW would not have been permitted to return to campus, would not have been there to rape DOE, and DOE would not now be suffering these harms. MARQUETTE's treatment of DOE in the aftermath of the attack further exacerbated these problems.

67. Second, although DOE earned some school credits while at MARQUETTE, she now has to start over, almost entirely. Credits in nursing classes from MARQUETTE will not transfer to a new nursing program; DOE has to repeat those classes. DOE must now pay tuition for three more years of nursing school—despite having already paid well over $75,000 in connection with DOE's schooling at MARQUETTE. These three additional years of nursing school are expected to cost at least $90,000, and as much as $150,000.

68. Third, but for the events described in this Complaint, DOE would have graduated with her class in spring 2017. She then would have entered the workforce as a nurse, earning approximately $65,000 per year. Now, DOE's work as a nurse will be delayed for three years while she repeats the nursing program and earns her degree.

19

69.     In addition to the direct harm to DOE, MARQUETTE's actions have harmed others. DOE is aware of at least one other MARQUETTE student who was sexually assaulted by another MARQUETTE student. The student victim told DOE that she decided not to report the rape because she saw how MARQUETTE retaliated against DOE for making a report and standing by the charge.

### COUNT I
### Violation of 20 U.S.C. § 1681(a) (Title IX) – Deliberate Indifference

70.     DOE incorporates the foregoing allegations here.

71.     Pursuant to Title IX, no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

72.     The acts, and failures to act, perpetrated against DOE amounted to unlawful sexual harassment and discrimination on the basis of sex. MARQUETTE was on notice that KW had a history of sexual harassment, and by allowing him to remain on campus and delaying the Milwaukee Police Department's arrest of KW, MARQUETTE was deliberately indifferent to the harm to female students created by his presence at the university.

73.     One or more of MARQUETTE's administrators or officials, with authority to take corrective action on DOE's behalf, had actual notice of

20

the discrimination, both to DOE and by KW to others, and failed adequately to respond. Those failures amounted to deliberate indifference toward the unlawful sexual conduct that occurred, was occurring, or was likely to occur.

74. Additionally, MARQUETTE failed to enact, disseminate, or implement proper or adequate policies to discover, prohibit, or remedy the kind of discrimination DOE suffered. This failure included, without limitation, non-existent or inadequate customs, policies, or procedures for the recognition, reporting, investigation, and correction of unlawful discrimination, which is especially egregious in light of MARQUETTE's prior mishandling of sexual assault and harassment on campus and its assurances to the public that such mistakes would not be repeated. Those failures amounted to deliberate indifference toward the unlawful sexual conduct that had occurred, was occurring, or was likely to occur.

75. MARQUETTE further demonstrated deliberate indifference by failing to provide reasonable accommodations and remedial measures to support DOE and minimize the harm to her education that occurred as a result of the sexual assault.

76. As a result of MARQUETTE's deliberate indifference, DOE suffered loss of education opportunities and benefits, trauma and emotional distress, costly expenses related to being forced to transfer to another

21

institution and future costs of tuition, and future lost earnings as the result of her delay in entering the workforce.

## COUNT II
### Violation of 20 U.S.C. § 1681(a) (Title IX) – Retaliation

77.   DOE incorporates the foregoing allegations here.

78.   Pursuant to Title IX, no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

79.   Following the sexual assault, and despite the discouragement by MARQUETTE's Department of Public Safety, DOE reported the incident to the Milwaukee Police Department. DOE's report of the sexual assault constituted protected activity.

80.   MARQUETTE was aware that DOE reported the sexual assault to the police, and that KW in turn accused DOE of sexual assault. MARQUETTE then took adverse action against DOE, seeking to discredit her, and ultimately, cause her to leave MARQUETTE. This adverse action includes, but is not limited to, the specific instances described above. MARQUETTE took this adverse action against DOE because of her report of sexual assault, her continued participation in the criminal proceedings, and the ongoing threat that MARQUETTE believed DOE posed to the school.

22

81.    As a result of MARQUETTE's retaliation, DOE suffered loss of education opportunities and benefits, trauma and emotional distress, costly expenses related to being forced to transfer to another institution and future costs of tuition, and future lost earnings as the result of her delay in entering the workforce.

## COUNT III
## Negligence

82.    DOE incorporates the foregoing allegations here.

83.    MARQUETTE owed a duty of care to DOE.

84.    MARQUETTE breached the duty of care to DOE through its deliberate indifference to her sexual assault and subsequent retaliation against her, including but not limited to by allowing KW to remain on campus and delaying the Milwaukee Police Department's execution of an arrest warrant for KW despite knowledge of the risk he presented to female students, including DOE.

85.    MARQUETTE's breach of duty of care caused DOE significant harm, including but not limited to: trauma and emotional distress; costly expenses related to being forced to transfer to another institution and future costs of tuition; and future lost earnings as the result of her delay in entering the workforce.

23

## COUNT IV
## Negligent Infliction of Emotional Distress

86.     DOE incorporates the foregoing allegations here.

87.     MARQUETTE's conduct throughout DOE's time at the University fell below the standard of care necessary to protect DOE from the sexual assault and subsequent trauma and emotional distress, including but not limited to by allowing KW to remain on campus and delaying the Milwaukee Police Department's execution of an arrest warrant for KW despite knowledge of the risk he presented to female students, including DOE.

88.     MARQUETTE's conduct caused DOE significant harm, including but not limited to: trauma and emotional distress; costly expenses related to being forced to transfer and future costs of tuition; and future lost earnings as the result of her delay in entering the workforce.

WHEREFORE, Plaintiff JANE DOE, requests judgment in her favor and against Defendant, as follows:

a.     Compensatory damages;

b.     Punitive damages;

c.     Attorneys' fees, costs, and expenses;

d.     Prejudgment interest; and

e.     To grant further relief as this Court should find just and proper.

24

## DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, JANE DOE, by and through her attorneys, SALVATORE PRESCOTT & PORTER, PLLC, and hereby demands a jury trial in this matter.

Dated: August 24, 2017      By:     <u>s/ Julie B. Porter</u>
                                                    Julie B. Porter Bar Number: IL 6243787
                                                    Attorney for Plaintiff
                                                    Salvatore Prescott & Porter, PLLC
                                                    1010 Davis Street
                                                    Evanston, IL 60201
                                                    Telephone: (312) 283-5711
                                                    Fax: (312) 724-8353
                                                    E-mail: porter@spplawyers.com